UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

LIXING CHEN A070 898 723 a/k/a
Lixin Chen A070 163 530,

                    Petitioner,

          v.                                                    9:25-CV-1320
                                                               (MAD/ML)
ACTING DIRECTOR OF ICE, Binghamton City Field Office;
KRISTI NOEM, Secretary of the U.S. Department of
Homeland Security; PAMELA BONDI, U.S. Attorney General,

                    Respondents.

_____

APPEARANCES:                                        OF COUNSEL:

THE LAW OFFICE OF THEODORE N. COX
Attorney for Petitioner
325 Broadway – Suite 201
New York, New York 10007

UNITED STATES ATTORNEY
Ransom P. Reynolds, Esq.
Assistant United States Attorney
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261

MAE A. D'AGOSTINO
United States District Judge

## DECISION and ORDER

## I.      INTRODUCTION

Petitioner Lixing Chen seeks federal habeas relief pursuant to 28 U.S.C. § 2241.  Dkt.

No. 1. Petition ("Pet.").  After an expedited briefing schedule, the Court issued a Decision and

Order denying the habeas petition, in part, and seeking further information related to the

government's efforts to effectuate petitioner's removal.  Dkt. No. 11, Decision and Order

1

("November Decision").  Specifically, the government was directed to

> produce . . . any information or documents related to any efforts
> taken to effectuate petitioner's removal (including what steps were
> taken prior to the September 15 Notice of Revocation of Release),
> including specifying the date (and, if applicable, time) of such
> steps, and any other information that may bear on whether there is
> significant likelihood of petitioner's removal to China in the
> reasonably foreseeable future[.]

November Decision at 13-14.  Moreover, in the preceding pages, the Court explicitly identified examples of pertinent evidence demonstrating the likelihood of removal, including, but not limited to, Congressional reports, news articles, and specific figures for the issuance and production of travel documents for Chinese nationals in the prior weeks or months.  *Id.* at 12-13.

The government timely filed its supplemental submission arguing that (1) the action is premature because the petitioner has not been detained for more than six months and (2) assuming petitioner has satisfied his initial burden under *Zadvydas*, the government has demonstrated a significant likelihood of his removal in the reasonably foreseeable future. Dkt. No. 12.  Petitioner's opposition contends that the government failed to provide the information which the Court specifically requested and, given the news articles and cases petitioner cites, there is substantial evidence that petitioner's removal to China is not reasonably foreseeable.  Dkt. No. 13.

## II.     DISCUSSION

The Court assumes the parties' familiarity with the Court's prior Decision and Order in this case, November Order, which laid out the relevant factual history and legal standards.

### A.      Sixty-Month Detention Period

The government first argues that petitioner's claim fails because he has not been detained beyond the presumptively reasonable sixty-month period of detention. Dkt. No. 12 at 5. Specifically, petitioner was first brought into custody on September 15, 2025; therefore, the government proffers any questions about petitioner's continued custody remain presumptively reasonable until March 15, 2026. *Id.* (citing cases decided in 2019 and 2021 whereupon petitioners' due process claims were denied because they had been detained for less than the six-month period).

However, recent cases have considered whether the government's logic is as definitive as their argument seems. This is because "*Zadvydas* does not control the question of whether the six-month period runs from the date an order of removal becomes administratively final . . . or from a later date, such as when a person who had been on release is detained or re-detained." *Medina v. Noem*, 794 F. Supp. 3d 365, 377 n.5 (D. Md. 2025); *see also Medina*, 794 F. Supp. 3d at 377-78 (discussing when and how the six-month presumptively reasonable period should run, specifically where the petitioner was detained significantly after the order of removal became administratively final).

Here, petitioner was ordered removed in 1994, and the challenges to that removal order ultimately concluded with a denial by the Board of Immigration Appeals in 2012. Petitioner has lived pursuant to, and consistently complied with, an Order of Supervision since 2008. Accordingly, while petitioner was presented with an arrest warrant and revocation of those conditions on September 15, 2025, the government fails to explain why that date controls and why the prior dates related to his removal order and its administrative challenges are irrelevant.

However, "regardless of when the six-month period runs, the point here is that any presumption . . . can be rebutted upon a showing that removal is *not* reasonably foreseeable." *Medina*, 794 F. Supp. 3d at 377 n.5. Despite the government's assertions that no information was provided to rebut this presumption, the undersigned explicitly discussed the information in the record which provided such a rebuttal. November Order at 13. Specifically, petitioner had been successfully released on conditions, for almost twenty years, as a law-abiding entrepreneur. *Id.* Petitioner never seemed to have been provided, or otherwise obtained, travel documents prior to the government's request for him to fill out an identification form earlier this year. *Id.* In sum, it is "unclear what has changed to make removal now reasonably foreseeable [to support detention], when it has not been for almost two decades." *Id.*

The "[reasonably foreseeable] analysis is inherently dynamic," which is why the undersigned "require[d] the government to produce . . . any and all documents and information related to any efforts taken to effectuate petitioner's removal[,]" acknowledging that "[n]ew information regarding the status of removal efforts or immigration proceedings," can make a huge impact on whether or not custody pending removal is constitutional. *Douglas v. Baker,* No. 25-CV-2243, 2025 WL 2687354, at *4 (D. Md. Sept. 19, 2025).

**B.      Reasonable Foreseeability for Removal**

In support of its brief, the government included a declaration from John Kloosterman, a Deportation Officer from the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"). Dkt. No. 12-1, Kloosterman Declaration ("Decl."). In it, Kloosterman provided additional details purporting to satisfy the Court's

direction for all documents and information related to efforts to effectuate petitioner's removal. Kloosterman Decl. ¶¶ 4-8.

On July 15, 2025, petitioner was instructed to apply for his Chinese passport and bring proof of submission to his next check-in to initiate the removal process. Kloosterman Decl. ¶ 4. On August 7, 2025, petitioner reported, as requested, and provided his application for a Chinese passport. *Id.* ¶ 5. On October 22, 2025, thirty-seven days after placing petitioner in custody, ICE submitted a formal request for petitioner's travel documents to the DHS attaché stationed at the Chinese embassy in Washington, D.C. *Id.* ¶ 6. Finally, on November 2, 2025, forty-eight days after petitioner was detained, petitioner's case was submitted to China for identify verification. *Id.* ¶ 7.

The government explains that after Chinese officials verify petitioner's identity, a travel document request will be reviewed by the Chinese government to effectuate petitioner's removal to China. Kloosterman Decl. ¶ 7. Moreover, the government assures, without any supporting statistics, that China is regularly issuing travel documents after verifying identities and that there have been ongoing commercial removals of noncitizens back to China. *Id.* ¶ 8. Despite the Court's explicit instructions, the government fails to provide a timeline with any indication for when these actions are anticipated to occur based on other deported Chinese nationals who have allegedly received such paperwork in the recent past.

In contrast to the government's vague and conclusory assertions that petitioner's travel documents will be issued in the near future, with a commercial removal flight shortly thereafter, the petitioner has provided a lengthy and articulate discussion about China's generally uncooperative stance receiving removed Chinese nationals. Dkt. No. 13 at 5-12.

Specifically, as early as 2015, an article published in Reuters identified the "backlog of nearly 39,000 . . . Chinese nationals awaiting deportation for violating U.S. immigration laws," and further noted the increasing backlog of unremovable Chinese nationals since "China has been extremely slow . . . to provide the proof of citizenship necessary to send visa violators home[, with s]ome of the nearly 39,000 Chinese immigrants . . . be[ing] under orders to leave for well over a decade." Mark Hosenball & Time Reid, *U.S. to China: Take back your undocumented immigrants*, REUTERS (Sept. 11, 2015), https://www.reuters.com/article/world/exclusive-us-to-china-take-back-your-undocumented-immigrants-idUSKCN0RB0D0/.

Further,

> a 2004 report by the United States General Accounting Office . . . notes ICE described "significant problems" obtaining travel documents from China which "consistently refused to issue travel documents." Traverse at 2–3, 3 n2 (citing United States General Accounting Office, *Immigration Enforcement: Better Data and Controls are Needed to Assure Consistency with the Supreme Court Decision on Long-Term Alien Detention* 21 (2004), http://www.gao.gov/assets/250/242498.pdf). Next, . . . a 2019 report by the Office of the Inspector General identif[ed] China as one of a handful of countries that had been "consistently categorized" as uncooperative in executing removal orders. *Id.* at 3 & n3 (citing Office of the Inspector General, *ICE Faces Barriers in Timely Repatriation of Detained Aliens* 19 n 32 (2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-03/OIG-19-28-Mar19.pdf).

*Chan v. Mayorkas*, No. 3:24-CV-1315, 2024 WL 5159900 (S.D. Cal. Dec. 18, 2024); *see also* CONG. RSCH. SERV., IMMIGRATION: "RECALCITRANT" COUNTRIES AND THE USE OF VISA SANCTIONS TO ENCOURAGE COOPERATION WITH ALIEN REMOVALS 1 (Jul. 10, 2020) (classifying China as a "[c]ountr[y] that systematically refuse[s] or delay[s] the repatriation of their citizens").

In 2021, the DHS authored an action plan specifically addressing the issue of unremovable Chinese nationals and explained that

> approximately 40,800 PRC [("People's Republic of China")] nationals [are] in the United States . . . subject to final orders of removal. Despite a proclaimed commitment to address this national security threat and adhere to international norms, the PRC has ignored more than 1,300 ICE requests for travel documents since October 2017.

U.S. DEP'T OF HOMELAND SEC. OFF. OF STRATEGY, POL'Y & PLANS, DHS STRATEGIC ACTION PLAN TO COUNTER THE THREAT POSED BY THE PEOPLE'S REPUBLIC OF CHINA: DEFENDING THE HOMELAND IN THE ERA OF GREAT POWER COMPETITION 15 (2021) *available at* https://www.dhs.gov/sites/default/files/publications/21_0112_plcy_dhs-china-sap.pdf.

China's continued refusal to accommodate removals was further memorialized by

> a 2022 announcement by the Embassy of People's Republic of China, indicating China suspended "cooperation on the repatriation of illegal immigrants" with the United States. *Id.* at 3 & n4 (citing Embassy of People's Republic of China, *The Ministry of Foreign Affairs Announces Countermeasures in Response to Nancy Pelosi's Visit to Taiwan* (August 5, 2022), http://us.china-embassy.gov.cn/eng/zmgx/zxxx/202208/t20220805_10735706.htm).

*Id.* As of November of 2023, an anonymous government official reported that "[o]f the 1.3 million people in the United States with final orders to be deported, about 100,000 are Chinese," leading the article's author to conclude that, of the handful of countries who refuse to take back their own citizens "China is the worst offender." Eileen Sullivan, *Growing Numbers of Chinese Migrants Are Crossing the Southern Border*, N.Y. TIMES (Nov. 24, 2023), https://www.nytimes.com/2023/11/24/us/politics/china-migrants-us-border.html.

However, in the early weeks of January 2025, DHS reported that it was able to send five "large-frame charter removal flight[s] in less than seven months to the People's Republic

of China [with] Chinese nationals with final orders of removal from the United States." U.S. DEP'T OF HOMELAND SEC., DHS CONDUCTS REMOVAL FLIGHT TO THE PEOPLE'S REPUBLIC OF CHINA (Jan. 10, 2025) *available at* https://www.dhs.gov/archive/news/2025/01/10/dhs-conducts-removal-flight-peoples-republic-china; *see also* Bo Gu*, Chinese Migrants in U.S. Illegally Uneasy After Fourth Removal Flight*, THE VOICE OF AMERICA (Dec. 13, 2024), https://www.voanews.com/a/illegal-chinese-immigrants-uneasy-as-us-conducts-fourth-china-removal-flight-/7901128.html (reporting that the first four flights, from June to December in 2024, carried a total of 350 Chinese citizens back to their homeland).[1]

However, as 2025 wore on, the prior and minimally incremental progress from 2024 proved to be quickly fleeting. In February of 2025, the first of three flights arrived in Panama, from the United States, carrying immigrants of various nationalities including Chinese citizens. *U.S. Deports Nearly 120 Asian Migrants of Different Nationalities to Panama*, REUTERS (Feb. 13, 2025), https://www.nbcnews.com/news/world/us-deports-panama-nearly-120-asian-migrants-different-nationalities-rcna192164. In total, 360 people of various backgrounds were expected to be deported to Panama. *Id.* However, these deportations were occurring to a third country, not directly to China. This arrangement appears to illustrate renewed difficulties obtaining direct repatriation clearance. Moreover, it appears that only one flight, with 122 Chinese nationals, has arrived in China from the United States since the beginning of the year. Briauna Brown, *ICE Dallas Deports 122 People on "High Risk Charter" Flight to China*, CBS NEWS (June 10, 2025).

As was previously discussed in the November Order,

---

[1] The undersigned notes that the report also touts that DHS "operated more than 740 international repatriation flights to more than 160 countries," during the 2024 fiscal year. U.S. Dep't of Homeland Sec., DHS Conducts Removal Flight to the People's Republic of China (Jan. 10, 2025) *available at* https://www.dhs.gov/archive/news/2025/01/10/dhs-conducts-removal-flight-peoples-republic-china. Of those 740 flights, only 4 went to China.

> Congress has authorized detention after a final order of removal, at least where removal is reasonably foreseeable . . . Deference to the executive branch and Congress's intent . . . are facts that courts must consider in deciding whether a *Zadvydas* petitioner has proven an entitlement to relief . . . But the Supreme Court distilled that deference, along with the requirement that immigration detention comply with due process . . . and directed that individuals remain in immigration detention only if there is a significant likelihood that the government will be removing the person to another country in the reasonably foreseeable future.

*Douglas*, 2025 WL 2997585, at *5. For several reasons, petitioner has demonstrated that, at this time, there is no significant likelihood that he will be removed from the United States in the reasonably foreseeable future.

First, the lengthy history of government reports and documents that, subject to a very short-lived exception in 2024, China is overwhelmingly disinterested in, and uncooperative at facilitating, the return of its nationals. The government has offered no substantive evidence to the contrary, relying only on two brief, generic, unsupported statements that China is following immigration policy by regularly issuing travel documents to facilitate ongoing removals.

Second, petitioner still remains in custody with no appreciable movement forward. It took months after his re-detention before his case was even submitted to China. There is no indication how long the process of actually issuing the necessary documentation will take, despite the government's representations alluding to the fact that these documents are being regularly issued and removal flights are routinely occurring. This lack of progress is in addition to the almost two decades petitioner has been under a removal order. *See Douglas*, 2025 WL 2997585, at *4 (citing cases finding it relevant to the *Zadvydas* calculation and deciding, upon re-detention, whether removal was reasonably foreseeable that petitioner had been under a removal order for years and any prior efforts at deportation were unsuccessful).

9

Finally, and perhaps most tellingly, the government produced no helpful, quantitative evidence in response to the Court's November Decision directing it to explain "whether there is a significant likelihood of petitioner's removal to China in the reasonably foreseeable future," November Decision at 14, such as "specific information suggesting rates of travel document issuance from China in recent weeks or months, whether and at what rates such documents have been issued to Chinese nationals, and/or how quickly those documents were produced [to] assist the court[] in determining the constitutional . . . challenges before it," *id.* at 12-13 (alterations to original) (citations omitted).  Instead, the government relies on two unsupported sentences in a one-page declaration that recites general immigration policy.  "The only reasonable inference to draw from that failure . . . is that no such evidence exits." *Douglas*, 2025 WL 2997585, at *4.

In sum, "the deference baked into the *Zadvydas* standard does not permit the government to detain a noncitizen and then sit on its hands.  Such inaction, or lack of progress in effectuating removal, is precisely what *Zadvydas* forbids."  *Douglas*, 2025 WL 2997585, at *5.  The government has failed to provide evidence that there is a significant likelihood that petitioner will be removed from the United States in the reasonably foreseeable future.  Therefore, petitioner is entitled to the issuance of a writ of habeas corpus.

III     **CONCLUSION**

**WHEREFORE** it is

**ORDERED** that the petition for a writ of habeas corpus, Dkt. No. 1, is **GRANTED**; and it is further

**ORDERED** that respondents are directed to transport petitioner to, and release him from, the ICE Enforcement and Removal Operations Office in Syracuse, New York no later

than twenty-one days from the date of this Decision and Order; and it is further

**ORDERED** that petitioner will be released subject to the same conditions of supervised release that applied prior to his detention.

**IT IS SO ORDERED.**

Dated:  December 9, 2025
       Albany, New York

_____
Mae A. D'Agostino
U.S. District Judge